**KIRKHOF ELECTRIC COMPANY, a Michigan corporation, in its own right, and as assignee of F. L. Jacobs Co., Grand Rapids Metalcraft Division, a Michigan corporation, Plaintiff,**

v.

**WOLVERINE EXPRESS, INC., a Michigan corporation, Defendant.**

**Civ. A. No. 2959.**

United States District Court
W. D. Michigan, S. D.
Aug. 6, 1958.

Williams & Damon, Grand Rapids, Mich., for plaintiff.

Schmidt, Smith, Howlett & Halliday, Grand Rapids, Mich., for defendant.

KENT, District Judge.

On July 1, 1955, Kirkhof Electric Company placed an order with the Westinghouse Electric Corporation for three transformers to be installed at the Grand Rapids Metalcraft Division of F. L. Jacobs Company. The order from Kirkhof to Westinghouse did not specify the carrier by which these transformers were to be shipped. On July 11, 1955, Metalcraft forwarded a purchase order to Kirkhof for the three transformers at a total price of $9,810, confirming previous oral negotiations. Metalcraft's purchase order specified that the transformers were to be shipped by rail. Kirkhof also had contracts with Metalcraft for the construction of an electrical substation, for the installation of the transformers, and for the installation of the secondary lines from the transformers to the factory "buss" connections.

The transformers in question were, for reasons unnecessary to this opinion, special orders and not the type transformers which were catalogued and sold as standard. On completion of the transformers, Westinghouse shipped them by truck, including the defendant carrier,

to Metalcraft in Grand Rapids. On arrival it was determined that the transformers had been damaged and they were refused. After some negotiations, of which there was little evidence, the transformers, which had been manufactured by Westinghouse in Sharon, Pennsylvania, were shipped to the Westinghouse repair shop in Chicago for repairs.

The basis on which the repairs were to be made is to be found in the deposition of R. C. Blakey, general foreman of the repair shop for Westinghouse in Chicago, which deposition was taken by the defendant but offered by the plaintiff, and received as Exhibit 13. On Page 4 of his deposition, the witness testified in part:

"We had an open order to repair these units in first class operating condition, and there were absolutely no restrictions as to the type or nature of the work necessary to put these jobs in that condition."

After repairs the transformers were shipped to Metalcraft in Grand Rapids on instructions from Kirkhof. Metalcraft refused to accept the transformers. Kirkhof advertised the transformers for sale, and also had them appraised by Westinghouse and by Clement Electric Company, a dealer in used electrical equipment and machinery in Grand Rapids. After negotiations Metalcraft accepted the repaired transformers at a lot price of $6,108.50. The testimony is that the figure arrived at was the result of computation of the cost at the then market of a fourth transformer in the event one of the three previously damaged should break down in service. This cost was deducted from the original price of $9,810, and settlement was agreed upon on that basis.

From the evidence it appears that Metalcraft is and has been for many years one of the best customers of Kirkhof. That it was absolutely essential to Metalcraft that the transformers be installed according to the contract between Kirkhof and Metalcraft. As stated by Joseph L. Seaman, Vice-president of Kirkhof: "They had us over a barrel."

Mr. Seaman testified that they had attempted to secure higher bids in order to force Metalcraft to pay a higher price for the repaired transformers. Admittedly Kirkhof fully expected that the transformers in question would be installed in the Metalcraft plant as soon as an agreement had been reached as to the price to be paid for the transformers. Kirkhof was in no position to delay the installation for any substantial period of time and still retain the good will of one of its best customers.

A conference was had on or about November 9, 1955, in the office of Metalcraft at which time Mr. Seaman, Mr. Russell H. Kirkhof, President and one of the founders of Kirkhof Electric Company, and Mr. Leo A. Funke, sales engineer for Westinghouse in Grand Rapids, attempted to persuade Metalcraft to accept the transformers at the original price. Each of the persons named testified he was satisfied at the time of the conference, after the transformers had been repaired and shipped, to Grand Rapids, that they were exactly as when shipped from Sharon, Pennsylvania, and that functionally they were as good as at the time of original shipment from Sharon, Pennsylvania.

There was produced as a witness Mr. Paul Bogdon, of Clement Electric Company, who testified that he never saw the equipment but from the information given to him he had written a letter to Kirkhof stating that in his opinion the transformers before the repair had a value of $4,000. At the time he testified he stated as his opinion that the repair cost would be approximately $2,000, that he would expect to make a profit of 20%, that the transformers would have a value after repair of $7,200. He further testified that he would not be interested in buying them at any price.

It is the theory and claim of the plaintiff that it is entitled to recover from the defendant carrier the cost of repairs, plus the depreciation in value. It is the theory and claim of the plaintiff that when Westinghouse shipped the transformers title passed to Kirkhof, that title

did not pass to Metalcraft because the carrier was not as specified in the Metalcraft purchase order. It is further plaintiff's theory and claim that the depreciated value is determined by the price which Metalcraft was willing to pay and did pay. Plaintiff is, however, willing to accept the valuation as stated by the witness Bogdon.

It is defendant's theory and claim that the plaintiff was acting as agent for Metalcraft in purchasing the transformers on special order; that the transformers became the property of Metalcraft when delivered to the carrier. It is further defendant's theory and claim that the measure of damage for injury to items which have no market value is the cost of repair and admittedly these transformers had no market value.

It is defendant's theory and claim that the depreciation in value is not an element of damage or in the alternative that no depreciation in value has been established by the evidence in this case. It is defendant's theory and claim that the transformers after being repaired were as new; that the inability of the plaintiff to deliver them to Metalcraft at the agreed price resulted from the relationship between plaintiff and Metalcraft rather than any depreciation in the value of the transformers.

The court is satisfied that the plaintiff was not acting as the agent of Metalcraft at the time that the order was placed by the plaintiff with Westinghouse. In Saums v. Parfet, 1935, 270 Mich. 165, 171, 258 N.W. 235, 237, the Supreme Court of Michigan defined agency as follows:

" ' "Agency" in its broadest sense includes every relation in which one person acts for or represents another by his authority.' 2 C.J. p. 419.

" 'Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or acts.' 21 R.C.L. p. 819.

" 'The characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons. To the proper performance of his functions therefore, it is absolutely essential that there shall be third persons in contemplation between whom and the principal legal obligations are to be thus created, modified or otherwise affected by the acts of the agent.' 1 Mechem on Agency (2d Ed.) p. 21."

The court is satisfied that there was no agency relationship between Kirkhof and Metalcraft. Rather there was a sale of goods by Kirkhof to Metalcraft, and the court is further satisfied that no title passed to Metalcraft until after November 9, 1955. The law to be applied is as stated by the court in Tuschman v. Pennsylvania R. Co., 3 Cir., 230 F.2d 787, 790:

"The question of responsibility under the bill of lading is a federal one to be resolved by application of general principles of common law."

Yet, as stated in J. B. Simpson, Inc. v. O'Hara, 1936, 277 Mich. 55, 59, 268 N.W. 809, 810:

" 'The authorities as well as the provisions of the Uniform Sales Act, are to the effect that the question of when title to property passes is one of intention to be ascertained from the terms of the contract and from the circumstances of the case.' Cadillac Machine Co. v. Mitchell-Diggins Iron Co., 205 Mich. 107, [120],' 171 N.W. 479, 484."

And despite the language of McDowell Associates, Inc. v. Pennsylvania R. R., D.C.N.Y.1957, 151 F.Supp. 894, 897:

"The consignor was the plaintiff McDowell, as such McDowell is the 'lawful holder' of the bills of lading and under the Carmack Amendment to the Interstate Commerce Act, [49 U.S.C.A. § 20(11)] is the proper party plaintiff."

This court is satisfied that it was the intention of the parties that title to the transformers should remain in Kirkhof

until accepted by Metalcraft unless delivered by the prescribed carrier, which they were not. Woodbine Children's Clothing Co. v. S. Goldnamer & Son, 134 Ky. 538, 121 S.W. 444, and see the Annotation in 31 A.L.R. 955.

Thus the title to the transformers was vested in the plaintiff when the carrier received them from Westinghouse, and the risk of loss and the right to recover was in Kirkhof.

The defendant carrier has denied negligence but admits liability for the damages, including the cost of repairs and the cost of shipping the transformers to the repair shop and return. Defendant has tendered this amount and deposited it with the Clerk of this Court.

As is so common there is an argument over the measure of damage. The United States Supreme Court in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, stated:

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible of the case, which he alone is responsible for making, were otherwise. * * *. As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. Allison v. Chandler, 11 Mich. 542, 550–556, * * *."

The general rule as to measure of damage is as stated in Illinois Cent. R. Co. v. Zucchero, 8 Cir., 221 F.2d 934, 937, where the court held:

"It remains to consider defendant's contention that the court did not apply the proper rule of damages in determining the amount recoverable. Each case must depend somewhat on its peculiar facts. Where property has been damaged in shipment the general rule for determining the amount of damages is the difference between the market value it would have had had it been transported without damage and its market value in its damaged condition. (citing cases.)"

However, in this case we cannot apply the usual method of measuring damages because the goods involved had no market value. There are cases which hold that the measure of damage is the cost of repairs but that consideration may also be given to depreciation in value of the repaired article. Brown v. Roland, 40 Cal. App.2d Supp., 825, 104 P.2d 138; Broadie v. Randall, 114 Kan. 92, 216 P. 1103, 32 A.L.R. 708, and see also Woodyard v. Barnett, 335 Mich. 352, 56 N.W.2d 214.

Defendant relies on O'Donnell v. Oliver Iron Mining Co., 262 Mich. 470, 477, 247 N.W. 720, 722, where the court held in part:

"Nevertheless, if defendant shows that the property can be repaired and restored to the condition it would have been in had it not been damaged by the subsidence, and also gives proper testimony as to the cost of the repairs, the court should make it clear to the jury that the question as to the permanency of the damage and, if reparable, the cost of repairs is one of fact for them to decide, if they conclude that defendant was responsible for the damage."

The American Law Institute has adopted the rule advocated by the plaintiff in Restatement of the Law of Torts, Section 928, p. 658, it is stated:

"Where a person is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for

"(a) the difference between the value of the chattel before the harm and the value after the harm or, at the plaintiff's election, the reasonable cost of repair or restoration where feasible, with due allowance for any difference between the original value and the value after repairs."

But see Jennings v. Piwinski, 136 Misc. 447, 241 N.Y.S. 349, and Patane v. State, 114 Misc. 713, 186 N.Y.S. 225, where the courts held that a plaintiff cannot recover both the cost of repairs and the depreciation resulting therefrom, particularly where it is doubtful as to whether the article has not been restored to its previous condition.

It is this court's opinion that the measure of damage should be that set forth in the Restatement of Torts, supra, with proper attention to the New York cases, Jennings v. Piwinski, supra, and Patane v. State, supra.

Westinghouse and Metalcraft were not parties to this contract. It was for the plaintiff to determine whether the transformers as repaired would be accepted or rejected. The defendant carrier should not be subject to the opinion or caprice of plaintiff's customer. When the transformers in question had been repaired and were guaranteed in the same manner as upon original manufacture and shipped to Grand Rapids, plaintiff through its president and its vice-president was satisfied that the transformers were new within the meaning of the law relating to measure of damage. They were so satisfied of this fact that they were willing to make every effort, as they stated, to persuade their best customer to accept the transformers at the original price of $9,810. If the plaintiff was so satisfied it is difficult to understand how it can come before this court and attempt to force the defendant carrier to pay a greater amount in damages because of the inability of plaintiff's executives to persuade a customer to accept the goods. The burden of the customer relations and the cost of maintaining the same between Kirkhof and Metalcraft is the responsibility of Kirkhof and not the responsibility of the defendant carrier.

For the reasons herein stated the court is satisfied that the plaintiff is entitled to recover the cost of repairs, plus the cost of shipping, plus the cost of certain advertising, all of which has been deposited with the Clerk of this Court by the defendant. Defendant having made a proper tender which was refused, defendant may have costs.